

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JDB:NMA/GMP
F.#2009R01786

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 7, 2009

<u>Via ECF</u>

The Honorable Marilyn D. Go
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:  United States v. Bana, et al.
           <u>Criminal Docket No. 09-672 (CPS)</u>

Dear Judge Go:

      Earlier this morning, a thirty-three count indictment
was unsealed charging fourteen defendants – including defendants
Anthony Sclafani, also known as "Scal," Joseph Sammartino, also
known as "Sammy," Joseph Loiacono, also known as "Joe Lefty,"
Anthony Pipitone, also known as "Little Anthony," Paul Spina,
also known as "Fat Paulie," Frank Pastore, also known as "Big
Frank," Peter Defilippo, Vito Pipitone and Joseph Spatola - with
various crimes related to their participation in the affairs of
the Bonanno organized crime family of La Cosa Nostra (the
"Bonanno family").[1] Defendants Sclafani, Loiacono, A. Pipitone
and Defilippo are charged with, <u>inter alia</u>, racketeering and
racketeering conspiracy, including varying predicate acts of
extortion, extortion conspiracy, bank fraud, narcotics
trafficking and illegal gambling; defendants Spina, A. Pipitone,
V. Pipitone, Spatola and Frank Terzo are charged with assault in
aid of racketeering conspiracy and multiple counts of assault in
aid of racketeering.

      The Indictment identifies these defendants as members
and associates of the Bonanno family, a violent criminal
enterprise that engages in a litany of crimes, including, among
others, murder, robbery, extortion, and obstruction of justice.
More specifically, defendant Sammartino is a Bonanno family

---

     [1]    The Indictment also charges a fifteenth defendant,
Richard Lotito, with extortion, extortion conspiracy and illegal
gambling.

captain and member of the Bonanno family ruling panel; defendant Sclafani is a Bonanno family captain; defendants Loiacono and A. Pipitone are Bonanno family acting captains; defendants Spina and Pastore are Bonanno family soldiers; and defendants V. Pipitone, Spatola and Natale Terzo are Bonanno family associates.

The defendants are scheduled to be arraigned before the Court at 2:00 p.m. The government respectfully submits this letter in support for its request for a permanent order of detention with respect to defendants Sclafani, Sammartino, Loiacono, A. Pipitone, Pastore, Defilippo, V. Pipitone and Spatola.[2] These eight defendants pose a danger to the community and a risk of flight and thus should be detained pending trial.

### Factual Proffer

The government proffers the following facts concerning the charges at issue and pretrial detention. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (the government is entitled to proceed by proffer in a detention hearing); United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995) (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

## I.   Overview of The Investigation

The Indictment returned in this matter is the result of an investigation by the Federal Bureau of Investigation ("FBI") of members and associates of the Bonanno family operating in the Eastern District of New York. The investigation included, among other things, consensual recordings of meetings between defendants Sclafani, Loiacono, A. Pipitone, Pastore, and other defendants, with witnesses, as well as testimony of eye witnesses and documentary evidence, including telephone records and bank records.

---

[2]   In light of the fact that defendant Spina is presently incarcerated, we do not move for a permanent order of detention against him at this time. The government reserves the right, however, to move for a permanent order of detention at the time of his arraignment. Moreover, the government makes this motion without prejudice to making additional arguments in support of the detention of any of the eight defendants whose detention the government seeks in this motion, and without prejudice to seeking a permanent order of detention against other defendants indicted in this matter.

The FBI investigation is the latest in a series of investigations of La Cosa Nostra prosecuted by this Office.  In those investigations, members and associates of the La Cosa Nostra have agreed to cooperate with the government, including high-ranking members of the Bonanno family, the Gambino organized crime family (the "Gambino family") and the Colombo organized crime family (the "Colombo family").  These cooperating witnesses have advised that the Bonanno family exists and that it is a violent criminal enterprise that engages in egregious criminal acts, including murder and assault, and crimes intended to obstruct justice.

II.  **Defendant Anthony Sclafani**

A.   **Defendant Anthony Sclafani Is A Captain In The Bonanno Family**

Defendant Anthony Sclafani is an inducted member of the Bonanno family, who currently holds the position of captain. According to a cooperating witness ("CW#1"), Sclafani initially reported to Bonanno family captain Anthony Graziano, also known as "TG."[3]  CW#1 presided over the ceremony, in approximately the early 2000s, during which Sclafani was inducted into the Bonanno family.  CW#1 stated that the ceremony took place at the home of Bonanno family member Joseph DeSimone, also known as "Joe Desi," and that in addition to Sclafani, at least two other individuals were inducted at that time.[4]  CW#1 further advised that Sclafani's cousin, defendant Joseph Loiacono, is an inducted member of the Bonanno family.  According to CW#1, defendants Sclafani and Loiacono were both responsible for picking up Bonanno family money from defendant Joseph Sammartino, also an inducted member of the Bonanno family, related to a joker-poker gambling business.  CW#1 further advised that between 2001 and 2004, he knew Sclafani and Loiacono to run a loanshark business. Specifically, Sclafani and Loiacono would borrow money from Graziano at a certain interest percentage, and would loan it to other individuals at a higher interest percentage.

---

[3]    On December 23, 2002, Graziano pled guilty to charges of racketeering conspiracy and tax fraud, and was later sentenced to one hundred and eight months' imprisonment. (02 CR 407) (NGG).

[4]    On April 28, 2006, DeSimone pled guilty to conspiracy to commit murder in aid of racketeering and other charges, and was sentenced to one hundred and forty-four months' imprisonment. (03 CR 1382) (NGG).

According to a confidential source ("CS#1"), from at least approximately 2005 through late 2008, Sclafani reported to defendant Joseph Sammartino, first as a soldier and later as an acting captain.

Sclafani's position in the Bonanno family has also been confirmed by consensual recordings of discussions in which Sclafani discussed his position.  For example, a November 4, 2008 consensual recording indicates that Sclafani noted that TG (a reference to Bonanno soldier Anthony Graziano) would be home (from prison) in two years, stating, "Wait 'til he hears I'm a skipper, TG."[5]  Earlier in the recording, Sclafani stated, "I took it (the promotion to captain) because they need me."  He continued, bragging about his ability to carry out crime on behalf of the Bonanno family without leaving his home:

> I don't want no money.  I just want what's coming to me.  I don't want no extra money. I don't want nobody else's money.  I want my fucking money.  I want nobody else's money. So I stay home all day.  I don't go out.  You know.  You see.  I don't answer the door.  I don't answer the phone.  So for them to get me, listen to me it's gonna take a long time. Listen, I really don't do anything wrong. Listen, I am what I am.  If you want to prove I'm a member of organized crime that's your business.  Could you prove it, then go prove it.

Sclafani went on, "It is what it is.  This is the family.  Our family."

Later in the recording, Sclafani recounted a conversation he had with Bonanno family member Louis Decicco, also known as "Louie Electric."[6]  Sclafani stated that when he was assigned to Decicco's crew, Decicco asked him if Sclafani knew what this life was made of.  Sclafani retorted, "a little bit," noting that he had been in "the life" for only twenty-five

---

[5]     All quotations contained herein are based upon references to draft transcripts and are therefore subject to modification.

[6]     On September 30, 2008, Decicco was convicted of racketeering, and sentenced to forty months' imprisonment.  (06 CR 800) (SLT).

to thirty years at the time.  Sclafani's membership in the
Bonanno family is also corroborated by other consensual
recordings, the testimony of other cooperating witnesses and
surveillance evidence.

### B.   Anthony Sclafani Is Charged With Recent Crimes Of Violence

Counts One and Two of the Indictment in the above-
captioned matter charge Sclafani with racketeering and
racketeering conspiracy, including predicate acts of extortion
and extortion conspiracy.  In addition, Sclafani is charged in
two counts with participating in the affairs of the Bonanno
family through the collection of unlawful debt from three
different victims, as well as nine other counts relating to his
extortionate activities on behalf of the Bonanno family.

In the past approximately five years, defendants
Sclafani, Loiacono and others made extortionate extensions of
credit to CS#1 and also engaged in the use of extortionate means
to collect extensions of credit, including directing defendant
Defilippo to seize CS#1's paycheck and cash it in order to
facilitate loanshark payments to Loiacono and others.
Additionally, defendants Sclafani, Loiacono, Defilippo and others
attempted to extort construction project-related "kickbacks" from
another victim, identified in the Indictment as John Doe #2,
through intimidation and threats of violence.

### C.   Anthony Sclafani Has Threatened To Murder His Loanshark Victims

Defendant Sclafani has made violent threats in order to
coerce loanshark victims to make payments, and also to intimidate
them.  Prior to CS#1's decision to cooperate with law
enforcement, CS#1 fell behind in his loanshark payments; at the
time, defendants Loiacono and Sclafani expected CS#1 to pay
Loiacono $1,000 in interest alone per week.  On one occasion when
CS#1 fell behind in his "juice" payments, defendant Sclafani told
him, "you're lucky we don't saw you in half and leave you in the
woods (referring to the woods near Sclafani's home)."  On another
occasion, Sclafani told CS#1, "if you weren't you (a reference to
CS#1's position as a longtime associate of the Bonanno family),
you'd be gone."

After CS#1 began cooperating with the government's
investigation, defendant Sclafani continued to threaten CS#1.
For example, during one consensually recorded meeting on October
5, 2007, Sclafani told CS#1 with regard to CS#1's outstanding

debt, "You have to do something or someone is going to get hurt here." Sclafani further advised him, in sum and substance, "You can't stay like this, you'll wind up getting hurt. Somebody will sneak you. It's a shame, if it gets to the wrong person, they'll say, 'whack this motherfucker.'" An October 9, 2007 indicates that during a meeting between CS#1 and defendant Sclafani, Sclafani urged CS#1 to get money from his family in order to repay the loan, stating, "tell your uncle you can't wait for the money, tell your uncle that we want to hang you from a fucking tree."

In early 2008, Sclafani began appearing at CS#1's home in the early morning hours in an attempt to collect loanshark payments. During a November 4, 2008 consensually recorded meeting, Sclafani told CS#1:

> I'm an old-fashioned East side guy. I just
> keep my mouth shut, I look. I do what I
> gotta do. If I tell you I'm gonna kill ya,
> I'm gonna kill ya. If I tell you I'm not
> gonna kill ya, I won't kill ya. I give you
> my word. But if I tell you, 'you got a
> fucking problem, I'm gonna kill you
> cocksucker,' you're gonna die. If it takes
> me a year, six months.

Defendants Sclafani and Loiacono also made violent threats directed toward another individual, identified in the Indictment as John Doe #2. During 2006 and 2007, John Doe #2 obtained subcontracting work on a construction job; thereafter, defendants Sclafani, Defilippo and Loiacono decided that John Doe #2 owed them 10% of the value of the job, and they began looking for him, asking others to contact him and threaten him on their behalf. For example, an August 22, 2008 consensual recording indicates that Sclafani asked CS#1 to contact John Doe #2, stating, "I'm trying to get a line on him." Sclafani told CS#1, "If you run into [John Doe #2] tell him, what do you think you're cute? You're fooling with the wrong people you jerkoff. It goes around. If they ever run into you . . ." Sclafani directed CS#1 to tell John Doe #2 that "they" are coming after him for the money because John Doe #2 has an obligation.

### III. Defendant Joseph Sammartino

#### A.  Defendant Joseph Sammartino Is A Captain In The Bonanno Family

Defendant Joseph Sammartino is an inducted member of the Bonanno family, who currently holds the position of captain. Recent source information also indicates that Sammartino is part of the "ruling panel" or committee currently running the affairs of the Bonanno family.  Specifically, CW#1 advised that Sammartino is an inducted member of the Bonanno family operating out of New Jersey.  CW#1 promoted Sammartino to the position of acting captain in approximately 2003.

Defendant Sammartino's position is confirmed by consensual recordings, the testimony of other cooperating witnesses and surveillance evidence.  For example, during a November 4, 2008 consensual recording, in response to CS#1's comment that Sammartino "must love" that Sclafani was promoted to captain; Sclafani responded that he was given responsibility for Staten Island and Sammartino was given responsibility for New Jersey.

#### B.  Joseph Sammartino Is Charged With Recent Crimes Of Violence

Count Seven charges Sammartino with participating in the affairs of the Bonanno family through the collection of unlawful debt.  He is also charged with two counts related to his extortionate activities on behalf of the Bonanno family.

#### C.  Joseph Sammartino Has Directed Others To Collect Loanshark Debts Using Threats of Violence

In early 2008, Bonanno family acting captain Anthony Pipitone raised the issue of CS#1's outstanding loanshark debt to Loiacono and Sclafani with the Bonanno family leadership.  At the time, consensual recordings indicate that Sclafani and Loiacono were in defendant Sammartino's crew and that after Sammartino became aware of the debt, Sammartino insisted that CS#1 continue paying and that Sammartino receive a portion of Loiacono and Sclafani's proceeds.  Prior to that time, a December 29, 2007 consensual recording indicates that Sclafani told CS#1 that Sclafani was in trouble with Sammartino because Sclafani owed over $50,000.  The recording further indicates that Sclafani said, "I'm lucky I don't get killed.  Lucky I don't get fucking killed.  If I wasn't 'this way' (a reference to his status as

"made" member of organized crime) I'd get killed."   In response,
CS#1 stated that defendant A. Pipitone told CS#1 that Sammartino
was well-liked.   Sclafani responded that Sammartino was a
"fucking asshole" and a "(ruthless, mean) cocksucker."

Later, during a May 9, 2008 consensual recorded meeting
between CS#1, Sclafani and Loiacono, Sclafani told CS#1 that he
spoke to Sammartino, who told him to "do whatever you gotta do to
get your money back."   Sclafani further advised that Sammartino
said he "wants that fucking money every month."

### D.   Joseph Sammartino Has Directed Others To Commit Other Uncharged Acts of Violence

According to CS#1, Sclafani advised that in
approximately 2006, Sammartino asked Sclafani and other
individuals to go "bust up" a bar in the Bronx, New York.   CS#1
advised that Sclafani told him he brought a gun with him in case
there was a confrontation.   CS#1 further advised that Sclafani
felt that Sammartino was "abusing" him by sending someone of his
age to carry out such a task.

## IV.  Defendant Joseph Loiacono

### A.   Defendant Loiacono Is An Acting Captain In The Bonanno Family

Defendant Joseph Loiacono is an inducted member of the
Bonanno family, who currently holds the position of acting
captain.   CW#1 identified Joseph Loiacono, also known as "Joe
Lefty," as Sclafani's cousin and business partner.   CW#1 also
presided over the ceremony during which Loiacono was inducted
into the Bonanno family, which occurred approximately within one
year of Sclafani's induction.   CW#1 advised that Loiacono was
also sponsored for membership in the Bonanno family by Graziano.

In addition, a review of the consensual recordings
corroborates Loiacono's participation in the Bonanno family.   For
example, during a July 4, 2008 consensually recorded meeting,
Loiacono stated the following:

> You know they're Bonannos if they say, 'Hey,
> Bo.  Hey, Bo.'  Get the fuck outta here.  I
> gave it up.  Ya know who used to do that all
> the time?  Joey Massina (a reference to
> Bonanno family Boss Joseph Massino).  Joey
> Massina.  Do I want to do what he used to do?

> No way.  'Cause every time I was in his
> company, 'Bo . . . hey bo.'

During a November 7, 2008 consensual recorded meeting - mere days
after Sclafani advised CS#1 that he had been promoted to captain
- Sclafani told CS#1 that while CS#1 can visit Sclafani anytime,
CS#1 has to go through Loiacono with any family business,
stating, "Go see Joey.  You know what I mean?  You don't mind?  I
can't do that no more.  They don't want me to do this shit.  You
know what I mean?  I'd love to do this, but I can't even do it no
more."  Loiacono's membership in the Bonanno family is also
corroborated by other consensual recordings, the testimony of
other cooperating witnesses and surveillance evidence.

    **B.**    **Joseph Loiacono Is Charged With Recent Crimes Of
Violence**

Counts One and Two of the Indictment in the above-
captioned matter charge Loiacono with racketeering and
racketeering conspiracy, including predicate acts of extortion
and extortion conspiracy.  Loiacono is also charged in two counts
with participating in the affairs of the Bonanno family through
the collection of unlawful debt from three different victims, as
well as five other counts relating to his extortionate activities
on behalf of the Bonanno family.

As set forth above, Loiacono, along with defendant
Sclafani and others, made extortionate extensions of credit to
CS#1 and also engaged in the use of extortionate means to collect
extensions of credit, including directing defendant Defilippo to
seize CS#1's paycheck and cash it in order to facilitate payments
to Loiacono and others.  Additionally, as described in greater
detail below, together with defendants Sclafani and Defilippo,
Loiacono attempted to extort payments from John Doe #2.

    **C.**    **Joseph Loiacono Has Threatened Extortion Victims With
Violence**

Between May 1, 2004 and November 17, 2008, CS#1
borrowed approximately $42,500 from Loiacono and others.  In that
time period, CS#1 paid Loiacono over $100,000.  At certain times,
CS#1 fell behind in making his weekly juice payments to Loiacono.
On one occasion, Loiacono told CS#1 that if he didn't start
paying, "we're going to have a problem."

With regard to the money allegedly owed by John Doe #2
to defendants Defilippo, Loiacono and Sclafani, Loiacono advised
CS#1 that John Doe #2 owed approximately $8,500 as kickback for

receiving work on a construction project.  In 2008, Loiacono repeatedly direct CS#1 to find John Doe #2, as well as the location of John Doe #2's business, the identity of his family members and most disturbingly, his home address.  During a June 20, 2008 consensually recorded meeting, Loiacono told CS#1:

> We don't want anything on what he's doing now (referring to John Doe #2's current construction project).  We got him in there though (referring to the previous construction project).  Tell him, 'don't be a jerkoff cocksucker.'  Cause, seriously, if you know where this kid lives, we're gonna hurt him then.  We are gonna hurt him.  He'll get hurt.  He'll get hurt.  Tell him.  I think Pete (a reference to defendant Defilippo) knows the address.  We'll get him. We'll get this kid.

Thereafter, during a July 18, 2008 consensually recorded meeting, Loiacono advised CS#1, "We'll get this kid.  I think we know where he lives.  Give it a little time.  I seriously mean it. Don't worry about it.  But we will get him."  During a September 25, 2008 consensually recorded meeting, Loiacono advised CS#1 that he had obtained CS#1's address and that he intended to go there early in the morning, stating, "I just want him to know somebody was there, at the house.  That makes these guys usually fucking get a little crazy."[7]

## V.    Defendant Anthony Pipitone

### A.    Defendant Anthony Pipitone Is A Captain In The Bonanno Family

Defendant Anthony Pipitone is an inducted member of the Bonanno family, who currently holds the position of acting captain.  Specifically, a cooperating witness ("CW#2") advised that A. Pipitone was inducted into the Bonanno family in approximately 2004.  CS#1 also advised that A. Pipitone was inducted into the Bonanno family in approximately 2004.

---

[7]    On November 17, 2008, FBI Special Agents executed a search warrant on Loiacono's person and recovered directions to the purported address of John Doe #2 referenced in this recording.

Defendant A. Pipitone's position is confirmed by consensual recordings, the testimony of other cooperating witnesses and surveillance evidence.  For example, during a January 4, 2008 consensual recording, Sclafani commented that before A. Pipitone was a "stram" (referring to an inducted member of organized crime), he never said anything, but now A. Pipitone is claiming all of "these guys."  During a November 12, 2007 consensually recorded meeting, A. Pipitone advised CS#1 that the guys that were around Louie Electric (a reference to Bonanno soldier Louis Decicco) are around A. Pipitone now.  A. Pipitone further advised that he took over Louie Electric's guys and Tony Green's guys (a reference to Bonanno soldier Anthony Urso), servicing all of them, including the whole crew from Staten Island and Long Island.[8]  Thereafter, on October 1, 2008, a consensual recording indicates that in response to CS#1's inquiry as to whether A. Pipitone was "bumped up" yet, A. Pipitone stated, "Me?  No, I'm still an acting, same thing," going on to explain that if they bumped him up to "official" (a reference to official captain), he'd have a bunch of morons around him like Palazzolo and Spina when they came home (from prison).

**B.    Anthony Pipitone Is Charged With Recent Crimes Of Violence**

Counts One and Two of the Indictment in the above-captioned matter charge A. Pipitone with racketeering and racketeering conspiracy, including predicate acts of extortion, extortion conspiracy, illegal gambling and narcotics trafficking. Defendant A. Pipitone is also charged in one count with participating in the affairs of the Bonanno family through the collection of unlawful debt, as well as two counts related to his extortionate activities on behalf of the Bonanno family.  Perhaps most significantly, Count Fifteen charges A. Pipitone with conspiracy to commit assault with a dangerous weapon and with intent to cause bodily injury, Count Sixteen charges A. Pipitone with assault in aid of racketeering with a dangerous weapon, Count Seventeen charges A. Pipitone with assault in aid of racketeering with intent to cause serious bodily injury, and Count Eighteen charges A. Pipitone with assault in aid of racketeering with a dangerous weapon.  These charges stem from defendant A. Pipitone's participation in the 2004 stabbing of two young men in Whitestone, Queens, described in detail below.

---

[8]    On February 11, 2005, Urso was convicted of racketeering conspiracy, and was sentenced to two hundred and forty month's imprisonment.  (03 CR 1382) (NGG).

**C.    Anthony Pipitone Participated In A Violent Assault On Behalf Of The Bonanno Family**

Based upon information learned during the course of the government's investigation, including eyewitness testimony, consensual recordings of statements made by the defendant and co-conspirators and information provided by confidential sources, defendant A. Pipitone, along with defendants Paul Spina, Vito Pipitone, Joseph Spatola and Frank Terzo, participated in the October 10, 2004 stabbing assault of two young men in Whitestone, Queens.  CS#1 has advised that Bonanno soldier Paul Spina was angry that the windows at the Napa & Sonoma restaurant located in Whitestone, Queens, had been broken because he considered Napa & Sonoma to be "around" him.  Napa & Sonoma was owned by Bonanno associate Natale Terzo, who is charged in the above-captioned Indictment with obstruction of justice and perjury.  According to CS#1, A. Pipitone advised that Spina stated, "I can't have this done to my place."  In the early morning hours of October 10, 2004, New York Police Department documents indicate that the windows at Napa & Sonoma were broken again.  Later that day, two individuals were violently assaulted in Whitestone, Queens, and rushed to the hospital.  One victim suffered a punctured lung and was admitted to the hospital's intensive care unit.  Later, defendants A. Pipitone and Spatola told CS#1 that somewhere near Napa & Sonoma, they and others pulled over a car that was associated with the breaking of the windows and that one of the "kids" in the car got stabbed.  CS#1 advised that Spatola stated that he pulled the driver out of the car through the window and gave him a beating; A. Pipitone stated that he gave the passenger a beating.

During an August 19, 2008 consensually recorded meeting between defendant Natale Terzo and CS#1, Terzo stated, "That, that Sunday.  That was the second time they broke the windows.  The second time.  It happened once . . ."  Terzo continued:

> They parked up over here, on the corner over here.  They had my son in the car.  Another car, with three of his friends.  Just drive around.  Just drive around and see what this kid Bonelli's driving.  See what he's driving, see where he is.  So Frankie (a reference to N. Terzo's son and co-defendant Frank Terzo) calls him.  And make sure you tell me.  So Frank calls him and says, 'Paulie, listen.  He's right behind me right now.'

* * * *

> Spina told him to keep driving, drive real
> slow.  They all waited for him by that turn
> over here.  By the other restaurant. . . My
> son, my son comes through, Paulie ( a
> reference to defendant Paul Spina), Anthony
> (a reference to defendant A. Pipitone), all
> jump out of the fucking car.  Vito (a
> reference to defendant V. Pipitone), they all
> jump out of the fucking car.  They gave them
> a fucking beating and told Frank to get out
> of there.

Terzo advised CS#1 that they had those little short knives,
"shivs," and they "got them good."  Terzo further advised that
Spina had three cars, and that Spatola pulled one "kid" out
through the window.  Terzo stated that after the stabbing, he saw
an ambulance there and he said, "oh shit, these fucking kids
died."

### D.   Anthony Pipitone Has Indicated His Willingness To Engage In Uncharged Acts Of Violence

During a June 6, 2008 consensually recorded meeting,
defendant A. Pipitone advised CS#1 that he was willing to assault
a bystander in front of Napa & Sonoma who was watching the
vehicle he was in.  A. Pipitone stated, "You're gonna make me
stab the guy, bro."  A. Pipitone continued, "if he came at us, I
would have wound up stabbing this mother fucker."  Later, A.
Pipitone reiterated, "If the guy would have said something,
believe me, I'd be the first one to tell you, I'm telling you.  I
told you, you're gonna make me stab this guy."

## VI.  Defendant Frank Pastore

### A.   Defendant Frank Pastore Is An Inducted Member Of The Bonanno Family

Defendant Frank Pastore is an inducted member of the
Bonanno family.  A confidential source has advised that Frank
Pastore was inducted into the Bonanno family in approximately the
last year or so.  This information has been corroborated by,
among other things, consensual recordings and surveillances.  For
example, during a November 7, 2008 consensually recorded meeting
between Sclafani and CS#1, Sclafani stated, "You take Big
Frankie.  I gotta few guys with me now, so don't worry about
that."

B.    Frank Pastore Will Commit Acts Of Violence And Threaten
      To Commit Acts Of Violence On Behalf Of The Bonanno
      Family

        During a November 7 2008 consensually recorded meeting,
Sclafani told CS#1 to bring defendant Pastore to a meeting with
him to resolve a loanshark debt on behalf of another individual,
stating, "Frankie will break his fucking hole."  Thereafter,
Pastore attended at least two meetings on behalf of the Bonanno
family to resolve the debt.

VII. Defendant Peter Defilippo

        A.    Defendant Peter Defilippo Is An Associate In The
              Bonanno Family

        CS#1 advised that Peter Defilippo is an associate in
the Bonanno family around defendant Sclafani.  CS#1 further
advised that between 2005 and 2008, Defilippo was the project
manager associated with a construction project in Newark, New
Jersey, who was responsible for providing Sclafani, Loiacono and
others with kickbacks from the project.  Defilippo's status as an
associate is also corroborated by consensual recordings and
information provided by other witnesses.

        B.    Peter Defilippo Is Charged With Recent Crimes Of
              Violence

        Counts One and Two of the Indictment in the above-
captioned matter charge Defilippo with racketeering and
racketeering conspiracy, including predicate acts of extortion,
extortion conspiracy and bank fraud.  Defilippo is also charged
in one count with participating in the affairs of the Bonanno
family through the collection of unlawful debt, as well as three
other counts relating to his extortionate activities on behalf of
the Bonanno family and one count each of bank fraud and uttering
forged securities.

        As set forth above, Defilippo informed Loiacono and
Sclafani that he believed John Doe #2 had not fulfilled his
alleged "kickback" obligation, requested their assistance, and
then provided Loiacono with John Doe #2's home address so that
Loiacono could threaten John Doe #2 at his home.  Additionally,
in 2007, CS#1 advised that Defilippo began cashing CS#1's
paychecks, providing CS#1 with only enough money to meet his
payroll obligations to his employees, telling CS#1 that the
balance of the paycheck would be presented to Loiacono.  CS#1

further advised that Sclafani told CS#1 that Defilippo knew that CS#1 owed Loiacono money.

VIII.    <u>Defendants Vito Pipitone and Joseph Spatola</u>

    A.    <u>Defendants Vito Pipitone and Joseph Spatola Are</u>
          <u>Associates In The Bonanno Family</u>

         A cooperating witness ("CW#3") has advised that Vito Pipitone and Joseph Spatola are associates in the Bonanno family, who were at one time on record with defendant A. Pipitone.  CW#3 further advised that V. Pipitone is the brother of A. Pipitone, and that Spatola is their cousin.  According to CW#3, defendants A. Pipitone, V. Pipitone and Spatola were always together and had a marijuana trafficking business.  Their status as associates is corroborated by consensual recordings and information provided by other cooperating witnesses and confidential sources.  For example, during a January 21, 2008 consensually recorded meeting, A. Pipitone told CS#1 that he "deal(s) with" Vito, a reference to defendant Vito Pipitone.  Thereafter, during an April 29, 2008 consensually recorded meeting, A. Pipitone discussed a recent newspaper article related to a letter authored by Bonanno soldier Gino Galestro that was intercepted in prison mail.  According to A. Pipitone, in the letter Galestro referred to A. Pipitone as a "friend" and V. Pipitone as an "associate."  A. Pipitone advised, "That's Paulie talking to [Gino].  Who knows my brother good?  Paulie.  John (referring to Bonanno soldier John Palazzolo) don't know him, and the guys in MDC don't know my brother."  Additionally, during a June 6, 2008 consensually recorded meeting, A. Pipitone told defendant N. Terzo that he was Spatola's best man at his wedding just eight months prior.

    B.    <u>Defendants Vito Pipitone and Joseph Spatola Are Charged</u>
          <u>With Crimes Of Violence</u>

         The Indictment charges defendants Vito Pipitone and Joseph Spatola with crimes of violence: conspiracy to commit assault with a dangerous weapon and with intent to cause bodily injury, assault in aid of racketeering with a dangerous weapon, assault in aid of racketeering with intent to cause serious

bodily injury, and assault in aid of racketeering with a dangerous weapon.

**C.   Defendants Vito Pipitone and Joseph Spatola
Participated In A Violent Assault On Behalf Of The
Bonanno Family**

As set forth above, defendants V. Pipitone and Spatola
participated in the violent stabbing and beating that occurred in
2004, which resulted in the hospitalization of two individuals -
one with serious bodily injuries.  Spatola, in particular,
described his role in the assault to CS#1, noting that he pulled
one of the victims out of the car through the window.

## IX.  Analysis

### A.   Legal Standard

#### 1.   Bail Reform Act

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq.,
federal courts are empowered to order a defendant's detention
pending trial upon a determination that the defendant is either a
danger to the community or a risk of flight.  See 18 U.S.C.
§ 3142(e) ("no condition or combination of conditions would
reasonably assure the appearance of the person as required and
the safety of any other person and the community").  A finding of
dangerousness must be supported by clear and convincing evidence.
See Ferranti, 66 F.3d at 542; United States v. Chimurenga, 760
F.2d 400, 405 (2d Cir. 1985).  A finding of risk of flight must
be supported by a preponderance of the evidence.  See United
States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760
F.2d at 405.

The Bail Reform Act lists four factors to be considered
in the detention analysis: (1) the nature and circumstances of
the crimes charged, (2) the history and characteristics of the
defendant, (3) the seriousness of the danger posed by the
defendant's release, and (4) the evidence of the defendant's
guilt.  See 18 U.S.C. § 3142(g).

#### 2.   Organized Crime Defendants

Courts in this circuit routinely have faced the issue
of pretrial detention of organized crime defendants charged with
racketeering-related offenses.  See, e.g., United States v.
Cirillo, Cr. No. 05-212 (SLT), slip op. (E.D.N.Y. 2005) (Genovese
family acting bosses Dominick Cirillo and Lawrence Dentico, as
well as Genovese family captain Anthony Antico, detained as
dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir.

2005); <u>United States v. Gotti</u>, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), <u>aff'd</u>, <u>United States v. Ciccone</u>, 312 F.3d 535, 543 (2d Cir. 2002); <u>United States v. Agnello</u>, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); <u>United States v. Defede</u>, 7 F. Supp. 2d 390, 395-96 (S.D.N.Y. 1998) (Luchese family acting boss Joseph Defede detained as danger to the community); <u>United States v. Salerno</u>, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community), <u>order vacated</u>, 794 F.2d 64 (2d Cir.), <u>order reinstated</u>, 829 F.2d 345 (2d Cir. 1987).

Together, these cases stand, at the very least, for the following propositions: (1) leaders of a violent organized criminal enterprise are dangerous due to their position of authority in that enterprise; (2) organized crime defendants often constitute dangers to the community due to the high likelihood that they will continue to commit crimes if released on bail; and (3) elaborate bail packages involving home detention and electronic monitoring are insufficient safeguards to protect the community against dangerous organized crime defendants.

### a. Organized Crime Leaders Are Dangers to the Community

Pretrial detention is warranted where defendants, charged with violent crimes, are leaders or high-ranking members of a criminal organization whose activities routinely include violence and threats of violence. <u>See</u> <u>Ciccone</u>, 312 F.3d at 543; <u>United States v. Colombo</u>, 777 F.2d 96, 99-100 (2d Cir. 1985); <u>United States v. Bellomo</u>, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996). Courts in this circuit have recognized that when organized crime depends on a pattern of violent conduct of the sort charged in this case, the risk to the community is substantial and justifies detention.

For example, a court in this district denied bail to the acting boss of the Genovese family for his criminal activities on behalf of the Genovese family, who "participated at the highest levels in directing an organization alleged in the indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," <u>Cirillo</u>, slip. op. at 7, as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," <u>id.</u> at 11. The Second Circuit affirmed those findings by summary order.

See 149 Fed. Appx. at 43 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only from their own violent activities but from those of subordinates whom they supervise.") (citing Ciccone, 312 F.3d at 543).

　　In addition, to be detained as a danger to the community, an organized crime defendant need not be charged in specific predicate acts of violence; it is enough that his position is at the helm of a violent organization.  Ciccone, 312 F.3d at 542-43; see also Ferranti, 66 F.3d at 543 (noting that the defendant need not have committed the violence himself; he can be deemed dangerous if he directed others to commit acts of violence) (citing Colombo, 777 F.2d at 98).  As one court best described it, an organized crime leader "is dangerous because inherent in the leadership position is the supervision of criminal activity that cannot be curtailed by any condition or combination of conditions of release."  Gotti, 219 F. Supp. 2d at 299-300 (citations omitted).

　　The government is not suggesting that mere association with organized crime should be the basis for a decision to deny bail in any given case, but rather that bail is inappropriate in cases where there is evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise.  As the court held in United States v. Defede:

>     it is well established that persons who hold
>     Defede's status routinely engage in conduct
>     that is a menace to public safety.  The
>     argument thus is based not on the status, but
>     on the inference that a person in Defede's
>     position is quite likely to engage in
>     dangerous conduct - just as one reasonably
>     could infer that one holding the position of
>     major league baseball pitcher is entirely
>     likely to hurl a small white object in the
>     direction of home plate.

7 F. Supp. 2d at 392 n.4.

　　Moreover, in enacting the Bail Reform Act, Congress recognized that certain defendants, such as high-ranking members of an organized crime family fall within a "'small but identifiable group of particularly dangerous defendants as to

whom neither the imposition of stringent release conditions nor
the prospect of revocation of release can reasonably assure the
safety of the community.'" Colombo, 777 F.2d at 99 (quoting S.
Rep. No. 225 98th Cong., 1st Sess. at 6-7, as reprinted in 1984
U.S. Code Cong. & Admin. News 3182 ("Senate Report"), 3188-89).

        Nor is the above caselaw narrowly limited to organized
crime "bosses" or "acting bosses." In Salerno, 631 F. Supp. at
1374-75, the court held that a defendant would be a danger to the
community if released on bail based on evidence that he was a
captain in an organized crime family who managed the enforcement
operations of the enterprise. In Colombo, 777 F.2d at 99-100, a
captain of a crew in the Colombo family was ordered detained
because the operation of that organization posed a risk to the
public and a danger to the community by its "consistent pattern
of orchestrating a series of violent criminal operations."
(internal quotation marks omitted).

                    b.    Organized Crime Defendants Are Likely
                          to Commit Crimes if Released on Bail

        Organized crime defendants pose a particular threat to
the community due to the continuing nature of the charged
enterprise and its violent criminal activities. At bottom,
because organized crime defendants are career criminals who
belong to an illegal enterprise, they pose a distinct threat to
commit additional crimes if released on bail. See Salerno, 631
F. Supp. at 1375 (finding that the illegal businesses of
organized crime require constant attention and protection, and
recognizing a strong incentive on the part of its leadership to
continue business as usual).

        In addition, defendants pose a danger to the community
not only when they commit acts of violence, but when it is likely
that they will commit even non-violent crimes that are
detrimental to the community. See Senate Report at 3195
("language referring to safety of the community refers to the
danger that the defendant might engage in criminal activity to
the detriment of the community . . . . The Committee intends
that the concern about safety be given a broader construction
than merely danger of harm involving physical violence."). In
Bonanno, the court held "[i]n light of Congress' direction that
'[w]here there is a strong probability that a person will commit
additional crimes if released, the need to protect the community
becomes sufficiently compelling that detention is, on balance,
appropriate.'" 777 F.2d at 99 (quoting Senate Report at 3189).
In Salerno, the court upheld the detention of two leaders of the
Genovese organized crime family, noting:

> The activities of a criminal organization
> such as the Genovese Family do not cease with
> the arrest of its principals and their
> release on even the most stringent of bail
> conditions.  The illegal businesses, in place
> for many years, require constant attention
> and protection, or they will fail.  Under
> these circumstances, this court recognizes a
> strong incentive on the part of its
> leadership to continue business as usual.
> When business as usual involves threats,
> beatings, and murder, the present danger such
> people pose in the community is self evident.

631 F. Supp. at 1375.

> c.   **Elaborate Bail Packages Are Insufficient to
>      Protect the Community Against Violent
>      Organized Crime Defendants**

Finally, the Second Circuit repeatedly has rejected
"elaborate" bail packages for dangerous defendants, including
leaders of organized crime families shown to be involved in
violent criminal activities.  See United States v. Dono, Nos. 07-
5333-cr(L), 07-5334-cr(CON), 2008 WL 1813237, at *2-3 (2d Cir.
April 23, 2008) (rejecting conditions that included, among
others, home detention and electronic monitoring, and a
requirement that the defendant's father – a retired police
officer – take "personal responsibility" for the defendant);
Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail secured by
real property); United States v. Orena, 986 F.2d 628, 630-33 (2d
Cir. 1993) (rejecting $3 million bail secured with real property,
in-home detention, restricted visitation and telephone calls, and
electronic monitoring); Colombo, 777 F.2d at 97, 100 (rejecting,
among other conditions of release, $500,000 bail secured by real
property).

The Second Circuit has viewed home detention and
electronic monitoring as insufficient to protect the community
against dangerous individuals.  In United States v. Millan, the
Second Circuit held that:

> Home detention and electronic monitoring at
> best elaborately replicate a detention
> facility without the confidence of security
> such a facility instills.  If the government
> does not provide staff to monitor compliance
> extensively, protection of the community

would be left largely to the word of [the
defendants] that [they] will obey the
conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (internal citations and
quotation marks omitted). See also Orena, 986 F.2d at 632
("electronic surveillance systems can be circumvented by the
wonders of science and of sophisticated electronic technology")
(internal citation and quotation marks omitted).

        Similarly, courts in this district have denied
dangerous defendants bail in recognition of the Second Circuit's
dim view of the effectiveness of home detention and electronic
monitoring. See, e.g., Dono, 2008 WL 1813237, at *2-3 (noting
that the idea that "'specified conditions of bail protect the
public more than detention is flawed'") (quoting Orena, 986 F.2d
at 632); United States v. Cantarella, No. 02-CR-307 (NGG), 2002
WL 31946862 at *3-4 (E.D.N.Y. 2002) (adopting "principle" of
"den[ying] bail to 'dangerous' defendants despite the
availability of home detention and electronic surveillance and
notwithstanding the value of a defendant's proposed bail
package"); Agnello, 101 F. Supp. 2d at 116 (Gershon, J.) ("the
protection of the community provided by the proposed home
detention remains inferior to that provided by confinement in a
detention facility"); United States v. Masotto, 811 F. Supp. 878,
884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit
appears to be saying to us that in the case of 'dangerous
defendants' the Bail Reform Act does not contemplate the type of
conditions suggested by this Court [including home confinement
and electronic monitoring] and that, even if it did, the
conditions would not protect the public or the community, given
the ease with which many of them may be circumvented").

## X.   The Defendants Should Be Detained

### A.   The Defendants Are a Danger to the Community

        Defendants Sammartino, Sclafani, Loiacono, A. Pipitone,
Pastore, V. Pipitone and Spatola pose a substantial danger to the
community.  Each defendant is affiliated with a violent criminal
enterprise.  Many of them have engaged in violence, planned
violence, contemplated carrying out violent acts or directing
others to do so and thereafter used dangerous weapons in carrying
out violent acts.  As discussed more specifically below, each of
the relevant considerations under the Bail Reform Act strongly
favors detention here.

1.   <u>Nature and Circumstances of the Crimes Charged</u>

First, as set forth below, each of the defendants is charged with crimes of violence under the relevant provisions of the Bail Reform Act.  <u>See</u> <u>Ciccione</u>, 312 F.3d at 542 (citing 18 U.S.C. §§ 3156(a)(4)(A), (B)) (Bail Reform Act defines a "crime of violence" as an offense that has as one of its elements the "attempted use, or threatened use of physical force against the person or property of another," or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense"); <u>Chimurenga</u>, 760 F.2d at 404 (conspiracy to commit a crime of violence is a crime of violence for purposes of the Bail Reform Act).[9]

Specifically, defendants A. Pipitone, V. Pipitone and Spatola are charged with, <u>inter alia</u>, assault in aid of racketeering in relation to the violent stabbing assault that occurred on October 10, 2004.  In addition, Anthony Pipitone is charged with extortion, extortion conspiracy and marijuana distribution.  Defendants Defilippo, Loiacono and Sclafani are charged with multiple counts of extortion and extortion conspiracy, all of which are crimes of violence.  Defendant Sammartino is also charged with extortion and extortion conspiracy.

Because the charges against these defendants are crimes of violence, there is a presumption under the Bail Reform Act that no condition or combination of conditions will reasonably assure their appearance or the safety of the community were they to be released.  <u>See</u> 18 U.S.C. § 3142(e).  The rebuttable presumption shifts the burden of production to the defendants. <u>See</u> <u>Martir</u>, 782 F.2d at 1144.  Moreover, even if the defendants satisfy this burden, the court should continue to give some weight to the presumption, "keeping in mind that Congress has found that these offenders pose special risks" and that "a strong probability arises that no form of conditional release" will adequately protect the community.  <u>Id.</u> (applying standard with regard to the presumption of flight) (citation omitted and internal quotation omitted).

---

[9]   Only Pastore is not charged with a crime of violence. Instead, Pastore is charged with collecting an unlawful debt on behalf of the Bonanno family and as set forth above, in Sclafani's own words, was ostensibly willing to use violence to do so.

### 2.   History and Characteristics of the Defendants

The defendants' history and characteristics also clearly favor detention.

#### a.   Anthony Sclafani

As noted above, defendant Sclafani is a captain in the Bonanno family, a violent criminal enterprise, and is charged with over ten counts of extortion and extortion conspiracy.  More significantly, as set forth above in detail, defendant Sclafani has clearly demonstrated his willingness to engage in threats of violence and violence on behalf of the Bonanno family.  As Sclafani put it, "[The Bonanno family] is the family.  Our family."  Sclafani explicitly threatened one witness, telling him on multiple occasions that Sclafani or someone else might "sneak" him or saw him in half for failure to pay his loanshark obligation.  As Sclafani stated in a March 27, 2008 consensual recording, "Look at me.  I don't give a fuck who comes to me. You understand?  I told him I don't give a fuck who comes to me, we're gonna have a fucking problem here.  You understand?  I don't give a fuck about nobody.  That's the way I am.  You're my friend.  Don't fuck around with me."

#### b.   Joseph Sammartino

Defendant Sammartino is a captain in the Bonanno family.  As set forth above, Sammartino directed Loiacono and Sclafani to collect the loanshark debt from CS#1, ordering them to pay him a piece of the proceeds.  A March 24, 2008 consensual recording indicates that Sclafani stated, "My skipper's involved (a reference to Sammartino).  So Joey's got to give him thirty-something thousand, this guy, for the backjuice."

On December 3, 1993, Sammartino was convicted of attempted assault in the first degree in New York County Supreme Court.  He was given an indeterminate sentence of incarceration of one to three years' imprisonment.

#### c.   Joseph Loiacono

Defendant Loiacono, an acting captain in the Bonanno family, is also charged with over ten different counts of extortion and extortion conspiracy.  Like Sclafani, consensual recordings reveal Loiacono discussing on multiple occasions his intention to using violence and intimidation to further his illegal goals, including collecting kickback payments from John Doe #2.  Indeed, during one such conversation, Loiacono is heard

discussing his efforts to obtain John Doe #2's home address and saying that, when he obtained the address, "we're gonna hurt him. He'll get hurt.  He'll get hurt."  And, in fact, when Loiacono was stopped and searched by the FBI, he was found with directions to John Doe #2's purported residence.

### d.   Anthony Pipitone

        Defendant Anthony Pipitone is an acting captain in the Bonanno family.  He is charged with extortion conspiracy, collecting an extortionate loan and four counts relating to assault in aid of racketeering, all of which constitute crimes of violence, among other offenses.  As set forth above, A. Pipitone participated in a violent assault which culminated in two individuals being hospitalized - one with very serious injuries.

        Pipitone is also charged with narcotics trafficking. He has a prior conviction for conspiracy to possess with intent to distribute heroin, for which he was sentenced to 63 months imprisonment.

### e.   Frank Pastore

        Defendant Pastore is a Bonanno family soldier.  He is charged for his participation in the collection of unlawful debt from John Doe #3, an individual whose identity is known to the grand jury.  At the behest of Bonanno captain Anthony Sclafani, defendant Pastore went to several meetings as the "muscle" to collect money on behalf of the Bonanno family.

        Pastore has a significant criminal history.  On July 3, 2001, Pastore was arrested by the FBI for Hobbs Act extortion, in violation of Title 18, United States Code, Section 1951; Pastore was later sentenced to thirty nine months' imprisonment and three years' supervised release.[10]  On October 26, 1992, Pastore was arrested by the New York City Police Department for robbery, criminal use of a firearm and other charges; he was later sentenced to a term of imprisonment of three to nine years.  On May 31, 1992, Pastore was arrested by the New York City Police Department for robbery and other charges; Pastore was later sentenced to one year of imprisonment.

---

        [10] On June 13, 2006, Pastore was charged with violating the terms of his supervised release; he was later sentenced to six months' imprisonment.

### f.   Peter Defilippo

Defendant Defilippo is an associate of the Bonanno family.  He is charged with multiple counts of extortionate collection of credit, extortionate collection of credit conspiracy, Hobbs Act extortion conspiracy and collection of unlawful debt RICO – all crimes of violence.  Defilippo is also charged with bank fraud and forging securities.

### g.   Vito Pipitone

Vito Pipitone is an associate of the Bonanno family. He is charged with multiple counts of assault in aid of racketeering, in relation to the violent assault described in detail supra.

### h.   Joseph Spatola

Defendant Spatola is an associate of the Bonanno family.  He is also charged with multiple counts of assault in aid of racketeering, in relation to the violent assault described in detail supra, which constitute crimes of violence.

### 3.   Seriousness of Danger Posed by the Defendants' Release

The seriousness of the danger posed by the defendants' release cannot be underestimated in light of their affiliation with the Bonanno family, a violent criminal enterprise, and their involvement in crimes of violence.  As noted above, courts in this circuit have recognized that when organized crime defendants, such as the defendants in this case, are charged with employing violent conduct, the risk of continued violent conduct is substantial and justifies detention.  See Salerno, 631 F. Supp. at 1364.

Moreover, a defendant poses a danger to the community not only when he commits acts of violence, but when he is likely to commit non-violent crimes that harm the community.  Here, beyond the crimes of violence described above, several of the defendants are charged with engaging in other crimes that are a detriment to the community, including narcotics distribution, bank fraud and illegal gambling.

4.   <u>Evidence of the Defendants' Guilt</u>

As discussed above, evidence of the defendants' guilt
is exceedingly strong.  The government intends to prove the
defendants' guilt at trial through the testimony of numerous
witnesses, including cooperating witnesses and eyewitnesses.  In
addition, the defendants were intercepted on consensual
recordings discussing the charged crimes.  Physical and
documentary evidence, such as phone records, bank records and
medical records underscore the defendants' guilt.

\* \* \* \*

In sum, in considering each of four relevant
"detention" factors, the aforementioned defendants are a danger
to the community and should be detained.

B.   <u>The Defendants Constitute a Risk of Flight</u>

The aforementioned defendants also constitute a risk of
flight.  On the current charges, each of the defendants
(excluding Defilippo) face up to twenty years' imprisonment.
Defilippo faces up to thirty years' imprisonment.

The significant sentences faced by these defendants
give them a substantial incentive to flee.  <u>See</u> <u>United States v.
Dodge</u>, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a
"severe sentence" heightens the risk of flight).

## XI.  Conclusion

For the reasons cited above, the government respectfully requests that the Court enter permanent orders of detention with respect to defendants Anthony Sclafani, Joseph Sammartino, Joseph Loiacono, Anthony Pipitone, Frank Pastore, Peter Defilippo, Joseph Spatola and Vito Pipitone.

Dated:      Brooklyn, New York
            October 7, 2009

                              Respectfully submitted,

                              BENTON J. CAMPBELL
                              United States Attorney

                    By:  _____/s_____
                              Nicole M. Argentieri
                              Gina M. Parlovecchio
                              Assistant U.S. Attorneys
                              (718) 254-6232/6228